IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

TRENTON ENERGY, LLC

        Plaintiff,

v.                                      CIVIL ACTION NO. 2:10-cv-00699

EQT PRODUCTION COMPANY,
        Defendant.

**MEMORANDUM OPINION & ORDER**

Pending before the court is the defendant's Motion for Summary Judgment [Docket 33]. For the reasons provided below, this Motion is **GRANTED.**

**I.    Background**

The dispute in this case involves the demise of the working relationship between the plaintiff, Trenton Energy, LLC ("Trenton"), and the defendant, EQT Production Company ("EQT"). In the fall of 2006, the defendant contacted the plaintiff to perform work on the defendant's natural gas leasehold sites in West Virginia. This working relationship continued until the fall of 2008, when it was terminated by the defendant. The plaintiff then filed the instant suit, alleging two causes of action based on the termination of its employment. Although the parties entered into a written contract, the plaintiff has not alleged that the defendant breached this contract, and instead seeks quasi-contractual relief based on allegations of an independent oral agreement and theories of reliance, promissory estoppel, and bad faith. A more detailed recitation of the facts follows.

    **A.    Relationship Between Trenton and EQT**

On or about October 31, 2006 the plaintiff began work for the defendant. The plaintiff alleges that "[a]t the outset of the business relationship between EQT and Trenton, defendant EQT represented to plaintiff Trenton that as long as plaintiff Trenton could and would provide sufficient equipment and manpower to adequately meet and perform EQT's work demands, then Trenton could rely and depend upon doing work for EQT." (Compl. [Docket 1-1], ¶ 6.) Trenton uses this alleged oral assurance, which was never memorialized into any type of writing, as the basis for its claims.

The parties entered into a Master Service Agreement ("MSA"), effective December 6, 2006. (Def.'s Mot. Summ. J. Ex. A [Docket 35-1].) The MSA contains a termination clause, which provides that the defendant will "have the right to terminate or suspend the Work or any part thereof under any Purchase Order and/or such other applicable Contract Documents, for its convenience and without cause, at any time, by providing forty-eight (48) hours prior written notice to Contractor [Trenton]." (Id. § 6.1.) The MSA also includes the following integration clause:

> The Purchase Order and Contract Documents as executed by the respective fully authorized representatives of Company [EQT] and Contractor [Trenton] constitute the entire agreement between the Parties hereto with respect to the matters dealt with herein, and there are no oral, electronic or written understandings, representations or commitments of any kind, express or implied, and all prior or contemporaneous oral, electronic or written understandings are either incorporated herein or are superceded.

(Id. § 19.9.) Further, the MSA includes a choice-of law-clause, which provides that the "Contract Documents shall be construed, interpreted and enforced in accordance with and shall be governed by the laws of the Commonwealth of Pennsylvania, excluding its conflict of law rules." (Id. § 19.1.)

**B.  Demise of the Relationship Between Trenton and EQT**

According to the Complaint, during the summer of 2008, at a job site conference, an EQT supervisor asked the CEO of Trenton to provide the EQT employee with "the keys to a camp in or

near the area in which EQT had its operations and which Trenton was working." (Compl. ¶ 15.) The plaintiff alleges that it informed the defendant that it did not own such property and would not provide a "camp." (Id. at ¶ 16.) The plaintiff further alleges that on a subsequent occasion, the same EQT supervisor again requested that he be provided a "camp". (Id. at ¶ 17.) On October 14, 2008 the defendant notified the plaintiff that it was terminating their relationship. (Id. at ¶ 13.) The plaintiff argues that the request for a "camp" constituted "an illegal demand," and that it was terminated for refusing to comply. (Plf.'s Resp. Mot. Summ. J. [Docket 40], at 1-4.)

The plaintiff alleges that at no time prior to termination did the defendant express dissatisfaction with its performance. The plaintiff alleges that when it asked the defendant why the relationship was terminated, an EQT official informed the plaintiff that the defendant had been dissatisfied with the plaintiff's rates and quality of work, however the defendant did not identify any specific failures of performance. The plaintiff alleges that the same EQT employee later informed the plaintiff that an internal investigation had resulted in a determination that there were no problems with the plaintiff's performance. According to the plaintiff, the same employee informed the plaintiff that EQT would "resume assigning work to Trenton," however, no additional work has been assigned. (Id. at ¶ 22-24.)

    **C.**    **Procedural History of the Instant Action**

On October 13, 2009, the plaintiff filed its complaint in the Circuit Court of Kanawha County, West Virginia. The Complaint contains two counts. In Count One, the plaintiff alleges that, in terminating the parties' relationship, the defendant breached the covenant of good faith and fair dealing, which is implied in every contract under West Virginia law, in the following ways:

> [B]y ratifying the termination of Trenton's work, by breaching its understandings and agreements with Trenton based on the attempt by an EQT supervisory employee to solicit a camp from plaintiff Trenton, by refusing to honestly and fairly deal with Trenton, by refusing to provide Trenton with truthful information, and by making it impossible for Trenton to continue to successfully perform Trenton's obligations under its understandings, representations, and agreements with EQT.

(Compl. ¶ 32.) In Count Two, the plaintiff asserts a quasi-contract claim based on a reliance theory. The plaintiff alleges that it reasonably relied on EQT's representation that EQT would provide work to the plaintiff as long as the plaintiff could provide sufficient labor and equipment by purchasing equipment, hiring employees, and making other business arrangements. (Compl. ¶¶ 36-38.) The plaintiff asserts that as a "direct result" of EQT's conduct, the plaintiff has "suffered significant and substantial financial losses. (Id. ¶ 39.)

On April 30, 2010, the defendant removed the case to this court pursuant to 28 U.S.C. §§ 1441 and 1446 [Docket 1]. On May 2, 2011, after numerous discovery disputes between the parties and requests for additional discovery time, the court issued a Second Amended Scheduling Order, which set distinct deadlines for liability and damages discovery, respectively [Docket 38]. On April 26, 2011, the defendant filed the instant Motion for Summary Judgment [Docket 35].

## II.     Legal Standard for Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

**III.    Discussion**

    **A.    Choice of Law**

"When exercising diversity jurisdiction, a federal district court must apply the choice-of-law rules of the state in which it sits." *Cavcon, Inc. v. Endress ?? Hauser, Inc.,* 557 F. Supp. 2d 706, 719 (S.D. W. Va. 2008). Accordingly, the conflicts rules of West Virginia apply to the present dispute.

"The first step in any choice-of-law analysis is to characterize the issues involved." *Pen Coal Corp. v. William H. McGee and Co., Inc.*, 903 F. Supp. 980, 983 (S.D. W. Va. 1995). The defendant asserts that the law of Pennsylvania applies because of the choice-of-law provision in the MSA, and the plaintiff asserts that West Virginia law applies because the MSA does not govern the entire

relationship between the parties.[1]  The plaintiff tangentially referenced the MSA, however, it has not actually alleged any claim for breach of contract.  These bad faith and reliance claims can generally be characterized as part-contract and part-tort.  *Id.*  In contrast to the usual bad faith claims, in the present case, the plaintiff asserts that its claims exist independently from the contractual relationship between the parties and are, instead, based on the defendant's actions.  These claims are distinguishable similar claims brought, for example, as ancillary claims to a breach of contract claim because they were brought in the absence of a breach of contract claim and my resolution of these claims here today does not require contractual liability between the parties.  The plaintiff's claims are properly characterized as tort claims, which are governed by "the traditional, general choice-of-law principle used in West Virginia of *lex loci delicti*."  *See Cavcon, Inc.*, 557 F. Supp. 2d at 720.  Under this theory, the "the substantive rights between the parties are determined by the law of the place of injury."  *State of West Virginia ex rel. Chemtall Inc., v. Madden*, 607 S.E.2d 772, 780 (W. Va. 2004).  The plaintiff alleges that it has suffered injuries in West Virginia, and, accordingly, the law of West Virginia applies.  I note, however, that my holding here today ultimately centers around basic and fundamental principles of law that are common to both jurisdictions, and thus an application of Pennsylvania law would likely produce identical results.

        **B.**     **Count One - Breach of the Covenant of Good Faith and Fair Dealing**

---

[1] My choice-of-law analysis is buttressed by the language of the choice-of-law provision, which states that the "Contract Documents shall be construed, interpreted and enforced in accordance with" the laws of Pennsylvania. (Def.'s Mot. Summ. J. Ex. A [Docket 35-1], at §19.1.) The plaintiff has not sought to have this court construe, interpret, or enforce the provisions of the contract because it has not alleged a breach of contract claim.  Nothing in my holding here today requires looking to the law of *either* Pennsylvania or West Virginia to interpret or enforce the MSA.

Although West Virginia recognizes an independent cause of action for a breach of the implied covenant of good faith and fair dealing, this implied covenant "does not provide a cause of action apart from a breach of contract claim." *Highmark West Virginia, Inc. v. Jamie*, 655 S.E.2d 509, 514 (W. Va. 2007). Thus, "a cause of action for breach of an implied covenant of good faith and fair dealing will live or die by the breach-of-contract claim." *Mullins v. GMAC Mortg., LLC*, No. 09-704, 2011 WL 1298777, at *3 (S.D. W. Va. March 31, 2011) (internal quotation marks omitted). The plaintiff has not asserted a breach of contract claim. Accordingly, the court **FINDS** that the defendant is entitled to summary Judgment on Count One of the plaintiff's Complaint.

    C.    **Count Two - Reliance**

In Count Two, the plaintiff seeks relief based on a reliance or promissory estoppel theory and, essentially asserts that the parties entered into a separate *oral* agreement, distinct from the MSA, under which the plaintiff would perform work for the defendant as long as the plaintiff met the defendant's "needs and expectations, and performed its work in a satisfactory manner." (Compl. ¶ 36.) The plaintiff alleges that it relied on this oral agreement and seeks "contractual and reliance damages." The defendant denies the existence of any such agreement and argues that any evidence of the external agreement is barred by the parol evidence rule.[2]

As discussed above, the MSA set out the general terms of the working relationship between the parties, however the MSA did not provide the specific terms, duration, or details of any of the construction projects performed by the plaintiff for the defendant. Instead, the MSA stated that "*in the event*, Company [EQT] desires to engage Contractor [Trenton] to perform work and services in

---

[2] Because my holding here today is based solely on the parol evidence rule, I need not address the defendant's remaining arguments.

connection with one or more such projects and desires to accept Contractor's bid or price quotation for the scope of work, Company shall issue a Purchase Order containing a scope of work to be performed at any identified Project." (Def.'s Mot. Summ. J. Ex. A [Docket 35-1] at §2.1) (emphasis added). The MSA explicitly allowed EQT to terminate or suspend work under any Purchase Order, "for its convenience and without cause at any time." (Id. § 6.1) The MSA also included an integration clause, which emphasized that the MSA and the Purchase Orders "constitute the entire agreement between the parties hereto," and that all prior or contemporaneous oral, electronic or written understandings are either incorporated herein or are superseded." (Id. § 19.9.) "Where a writing appears to be a complete contract, embracing all the particulars necessary to make a perfect agreement and designed to express the whole arrangement between the parties, it is conclusively presumed to embrace the entire contract and all the terms and provisions of the agreement." *Wood Cnty. Airport Auth. v. Crown Airways, Inc.*, 919 F. Supp. 960, 965 (S.D. W. Va. 1996). Here, the MSA and the Purchase Orders constituted a complete and integrated agreement between the parties.

"Ordinarily in West Virginia a written contract is considered to merge all of the negotiations and representations made prior to its execution, and extrinsic evidence is not available to alter or interpret language which is otherwise plain and unambiguous on its face." *Iafolla v. Douglas Pocahontas Coal Corp.*, 250 S.E.2d 128, 135 (W. Va. 1978). The plaintiff has not, and likely cannot, bring a claim for breach of contract because there is no evidence in the record that the defendant breached the MSA, which is the only *contract* at issue. "A contract containing unambiguous language must be construed according to its plain and natural meaning." *Wood Cnty. Airport Auth*, 919 F. Supp. at 965. The plaintiff's argument that it relied on a *separate* oral agreement is inapposite here because this alleged oral agreement is being offered by the plaintiff in

an attempt to alter and contradict clear and unambiguous provisions of the MSA.[3] As such, Count Two amounts to nothing more than an inartful attempt to circumvent the parol evidence rule by asserting that the parties entered into an ethereal parallel contract that was never reduced to writing.[4] "Parol evidence that would vary or supplement the terms of an unambiguous contract is excluded." *Wood Cnty. Airport Auth*, 919 F. Supp. at 965. As the Restatement (Second) of Contracts set out the rule, "[a] binding completely integrated agreement discharges prior agreements to the extent that they are within its scope." Restatement (Second) of Contracts § 213(2) (1981).

Additionally, the plaintiff's arguments that the alleged oral agreement was "independent" and not "within the scope" of the MSA are unpersuasive. The plaintiff alleges that, based on the alleged oral agreement, its continued employment was contingent not on the defendant's acceptance of bids

---

[3] On July 29, 2011, more than two months after responding to the pending Motion for Summary Judgment, the plaintiff sought leave from this court to file a supplemental response [Docket 61]. In support of its request, the plaintiff asserts that ongoing discovery has continued to reveal new and relevant information. Specifically, the plaintiff now asserts that the defendant made continued oral representations to the plaintiff regarding the duration of the parties working relationship even *after* the MSA was signed. The plaintiff asserts that these subsequent representations are not barred by the parol evidence rule.

To the extent the court is inclined to consider the plaintiff's untimely submission, it finds it unpersuasive. Although the plaintiff may well be correct that oral statements made subsequent to a written agreement between the parties are permissible under the parol evidence rule, this does not aid the plaintiff's case. "A valid, unambiguous written contract may be modified or superseded by a subsequent written or parol contract but only if the subsequent contract is based upon a valuable consideration." *Wilkinson v. Searls*, 184 S.E.2d 735, 741 (W. Va. 1971). Therefore, if the parties entered into an oral agreement *after* they entered into the MSA, then such agreement would need to be supported by consideration. Because the plaintiff has offered no evidence that it offered any consideration in exchange for an oral promise by the defendant to continue to provide the plaintiff with employment for an indefinite period of time, the plaintiff has failed to show any disputed material facts as to the existence of a valid and binding oral agreement between the parties.

[4] The court also notes that, to the extent that Count One is actually a claim for promissory estoppel, this court has explicitly held that "application of the parol evidence rule may not be circumvented by asserting promissory estoppel." *Wood Cnty. Airport Auth*, 919 F. Supp. at 965.

and willingness to employ the plaintiff, but rather on the plaintiff's ability to perform. The plaintiff further alleges that the MSA was "silent on the amount of work to be assigned to Trenton." (Pl.'s Resp. Mot. Sum. J. [Docket 40], at 9.) "[P]arol evidence cannot be used to supply any gap or omission in the terms of a written contract." *Wood Cnty. Airport Auth*, 919 F. Supp. at 965. Moreover, this argument misconstrues the simple fact that the MSA explicitly discusses the duration (at-will) and the quantity (when Trenton was awarded projects based on accepted bids) of the plaintiff's employment by the defendant. (Def.'s Mot. Summ. J. Ex. A §§ 2.1, 6.1.)

Accordingly, the court **FINDS** that there are no genuinely disputed factual issues as to whether the plaintiff is entitled to reliance damages in Count Two and further **FINDS** that the defendant is entitled to summary judgment as to Count Two of the plaintiff's Complaint.

### IV. Conclusions

For the foregoing reasons, the defendant's Motion for Summary Judgment [Docket 35] is hereby **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: August 2, 2011

Joseph R. Goodwin, Chief Judge